UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

John D. Keyes, Jr.,

    Plaintiff,

v.                                                   09-3153

Larry Phillips et al.,

    Defendants.

### Order Granting Summary Judgment

    The plaintiff is being held at Rushville Treatment and Detention Center pursuant to the Illinois Sexually Violent Persons Commitment Act, 725 ILCS 207/1 *et seq.*. He pursues a due process claim regarding deliberate indifference to pervasive sexual harassment by residents Daniels, Shanklin, and "K.E.N.", and deliberate indifference to the risk of sexual assault/battery presented by resident Daniels. For the reasons below, the defendants' motions for summary judgment are granted.

### Summary Judgment Standard

    "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(1). Genuine factual disputes are resolved in the nonmovant's favor, and reasonable factual inferences are drawn in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). If the movant shows that "there is an absence of evidence to support the nonmoving party's case[,]" the nonmovant must come forth with competent, admissible evidence to demonstrate a material factual dispute for trial, not simply rest on pleadings and allegations. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); Fed. R. Civ. P. 56(c)(1)(B).

### Facts

    These facts are set forth in the light most favorable to the plaintiff, as they must be on summary judgment.

*Resident Daniels*

1

The plaintiff arrived as a resident at Rushville Treatment and Detention Center in April 2007.  Shortly thereafter another resident in the plaintiff's unit, Ray Daniels, began verbally harassing and berating the plaintiff with sexual comments and innuendos.  For example, in June 2007, while the plaintiff was in the shower, Daniels yelled to the plaintiff from the dayroom, asking if the plaintiff needed any help taking his shower.  The plaintiff complained to the security therapist aides in the unit and to others, but nothing was done.  The plaintiff tried to ignore Daniels and began avoiding the dayroom and other places where he might have to interact with Daniels.  At that point, however, the plaintiff did not fear for his physical safety as Daniels had not made any physical advancements.  However, in July 2007, when the plaintiff was alone in his room with the door shut, Daniels opened the door, entered the room and asked the plaintiff, "When are you going to quit teasing me?"  The plaintiff told Daniels to go away and leave him alone, but Daniels replied that he was not going to go away and leave the plaintiff alone any longer.  Daniels then took steps towards the plaintiff, at which point the plaintiff yelled at Daniels and pushed him.  Two other residents came to the plaintiff's aid and removed Daniels from the plaintiff's room.

The July incident caused the plaintiff to fear that Daniels intended to sexually assault him.  The plaintiff reported the incident to several of the defendants but nothing happened immediately.  In September 2007, the plaintiff was moved to a different unit, greatly reducing his interactions with Daniels.  However, several months later, in January 2008, the plaintiff was escorted to a podiatrist appointment, where he discovered Daniels in the waiting room.  The plaintiff told the escorting guard (Defendant Moody) of his problems with Daniels, telling Moody that he did not want to be left in the waiting room with Daniels.  The guard gave the plaintiff two choices:  sit in the waiting room or refuse medical attention and return to his room.  The plaintiff did not want to wait another two or three months for an appointment, so he chose the former, reasoning that Daniels would probably not try anything since there were several other residents in the waiting room.  The guard then locked the residents in the waiting room and left.  Anyone walking by could see into the waiting room through its window, but there were no guards in the waiting room.  When the line in the waiting room dwindled to three residents (Daniels, the plaintiff, and another), Daniels scooted a chair next to the plaintiff and started whispering in the plaintiff's ear.  The plaintiff leaned as far away as possible, and then got up to move, but Daniels grabbed the plaintiff on the arm and squeezed his butt.  The plaintiff backed up against the door and told Daniels to "get the fuck away."  Daniels desisted, and a few minutes later the plaintiff was called for his appointment.  The plaintiff had no further encounters with Daniels, who was released in the Summer of 2008.

*Resident Shanklin*

In or around June 2007, the plaintiff worked in the dietary for two weeks.  During his work there, the plaintiff was repeatedly subjected to sexual comments and sexual jokes at the plaintiff's expense by another resident working in dietary, Shanklin.  For example, Shanklin made "nice ass" comments to the plaintiff, and other security guards chimed in, one wondering out loud how "deep [the plaintiff] could take it" and another saying, "It is okay with me if you guys want to go back behind the dishwasher. . . ."  (Plaintiff's Dep., d/e 81-2, p. 84).  The

2

following week Shanklin put his hand in front of the plaintiff's crotch but did not touch the plaintiff. One time, Shanklin swatted the plaintiff on the butt with a pan. *Id.* at 86-87. This all occurred in front of guards, who did nothing or played along.

The plaintiff's assignment to dietary lasted only two weeks, and he had no further notable problems with Shanklin until about two years later when the plaintiff and Shanklin were put in the same therapy group. The plaintiff informed his primary therapist of his history with Shanklin, asking to change therapy groups because he was not comfortable with Shanklin. The therapist denied the request. During one of the group therapy sessions, Shanklin admitted to harassing the plaintiff in dietary, but rationalized that it was "his understanding . . . that if [the plaintiff] didn't like that, then [the plaintiff] would have punched him." (Plaintiff's Dep., d/e 81-2, p. 94). The plaintiff repeatedly asked to move to a different group but the therapist determined that the two could continue in group therapy together. In the therapist's opinion, the plaintiff had not been forthcoming with all the facts and was attempting to manipulate Shanklin out of the group. The plaintiff ultimately refused to continue in group therapy with Shanklin. As a result, the plaintiff was terminated from group therapy for lack of attendance. At some later point, the plaintiff was put in a therapy group without Shanklin.

*Resident "K.E.N."*

This resident exposed himself to the plaintiff on one occasion.

**Analysis**

The plaintiff's claims fall under the Fourteenth Amendment due process clause since he is akin to a pretrial detainee, not a prisoner. *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005)(status of person awaiting trial for civil commitment under Sexually Violent Persons Act was comparable to pretrial detainee). The Seventh Circuit has stated that the Fourteenth Amendment protections are "'at least as great as the protections available to a convicted prisoner under the Eight Amendment.'" *Tesch v. County of Green Lake*, 157 F.3d 465, 473-73 (7th Cir. 1998), *quoting City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983). However, the Seventh Circuit has also stated that "'there is little practical difference between the two standards. *Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001), *citing Weiss v. Cooley*, 230 F.2d 1027 (7th Cir. 2000); *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir.2005) (applying Eighth Amendment analysis to a section 1983 claim brought by a Joliet facility resident awaiting a civil commitment trial). The Eighth (and Fourteenth) Amendment requires that Mr. Sain be housed under "humane conditions" and that he be protected against known, serious risks of harm. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To show a constitutional violation the plaintiff must prove both (1) that he suffered a sufficiently serious deprivation or was at a substantial risk of serious harm; and (2) that the defendants acted with deliberate indifference to those conditions or risks. *Id.*; *Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008).

Sexual comments, like other verbal harassment, do not alone violate the Constitution. *See DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000)("The use of racially derogatory

3

language, while unprofessional and deplorable, does not violate the Constitution. . . .Standing alone, simple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the laws."); *Dobbey v. Illinois Department of Corrections*, 574 F.3d 443, 446 (7th Cir. 2009)(verbal "harassment, while regrettable, is not what comes to mind when one thinks of 'cruel and unusual' punishment."). Daniels and Shanklin's comments were deplorable, and the guards should not have played along, but the comments still remain simple verbal harassment, nothing more. Daniels touched or made efforts to touch the plaintiff only twice, the first when he came into the plaintiff's room in the Summer of 2007, and the second about seven months later when he grabbed the plaintiff's arm and squeezed his butt in the health care waiting room. Shanklin touched the plaintiff only once, when he swatted the plaintiff on the butt with a pan. That is not enough evidence to show the kind of pervasive or severe sexual harassment that might be actionable under the Constitution. The defendants' failure to intervene to stop the behavior cannot be a constitutional claim because the behavior itself does not violate the constitution. Resident "K.E.N's" one-time exposure of himself to the plaintiff makes out no constitutional claim either.

As for the plaintiff's failure to protect claim, there is no evidence that the plaintiff was at any substantial risk of serious harm. Until Daniels came at the plaintiff in his room, even the plaintiff did not fear for his safety. That incident did arguably put the defendants who knew about it on notice that Daniels and the plaintiff should be separated (though not that Daniels posed a substantial risk of serious harm). Yet the two *were* separated about two months later and there were no further problems until, by chance, Daniels and the plaintiff found themselves in the same waiting room. The plaintiff did warn the escorting guard of his troubles with Daniels, but there is no evidence that the plaintiff was actually at a substantial risk of serious harm from Daniels at that point, much less that the guard was aware of such a risk. Daniels had never assaulted the plaintiff; there were other residents in the waiting room; and, the plaintiff himself decided that the risk was small enough to stay in the waiting room with no guard. With regard to Shanklin, Shanklin never even touched the plaintiff, except for swatting the plaintiff on the butt with a pan. The plaintiff did not want to be around Shanklin because of Shanklin's verbal harassment and offensive comments, not because he feared for his physical safety. In short, no rational juror could find that the defendants were deliberately indifferent to a substantial risk of harm to the plaintiff.

IT IS THEREFORE ORDERED:

1) The defendants' motions for summary judgment are granted (d/e's 81, 82). The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff. All pending motions are denied as moot, and this case is terminated, with the parties to bear their own costs.

2) If the plaintiff wishes to appeal this judgment, he must file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A

motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.

Entered this 2nd Day of September, 2011.

           **\s\Harold A. Baker**

           HAROLD A. BAKER
         UNITED STATES DISTRICT JUDGE